IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

BRENT DELZER and
JACOB STADFELD,

                Defendants.

OPINION AND ORDER

08-cr-138-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

One of the idiosyncracies of the American system of government is that both the federal and the state government may bring criminal prosecutions for the same conduct. This phenomenon is relatively rare, which may explain why some of the actors in this case did not focus on the possibility when the state began its investigation of the disappearance of Amos Mortier, a long-time player in the distribution of marijuana in southern Wisconsin.

Defendants Brent Delzer and Jacob Stadfeld seek dismissal of the federal indictment against them, asserting that the State of Wisconsin reached agreements with them under which it agreed that defendants would not be prosecuted if they told the truth about their

1

drug dealing. The state made it clear to defendants that it was not interested in prosecuting them for drug distribution; it was interested in information about those activities only as it shed light on the sudden and unexplained disappearance of Mortier, a drug associate of defendants. All of the parties, that is, the prosecutors, investigators, defendants and their counsel, assumed that the state authorities would handle the investigation of the Mortier case and its prosecution, if there were one. It was only when the assistant district attorney responsible for the case realized he was not going to get the information he wanted from defendants and the marijuana dealing was far more expansive in scope than he had anticipated, that he authorized the investigators (two local detectives) to seek the assistance of the United States Attorney in prosecuting the marijuana distribution case in federal court. The United States agreed to the request and brought an indictment against both defendants on August 8, 2008, charging them with conspiring to distribute marijuana in excess of 100 kilograms.

The defendants cried foul. They moved to dismiss the indictment on the grounds that they had been promised "global" immunity for any information they gave the state about the drug distribution, that this immunity bars the federal government from prosecuting them and that, even if they had not been given explicit immunity from federal prosecution, principles of equitable immunity require dismissal of the indictment. In response, the government denies that defendants were given global immunity, that is,

2

immunity from both state and federal prosecution, both because the facts do not support defendants' allegations and because the state is not legally capable of controlling the federal government's prosecutorial decisions. It denies that equitable immunity is applicable, noting that the court of appeals has never recognized such a doctrine, and it adds that even if defendants had immunity from prosecution, that immunity was conditioned on giving full and truthful information. When defendants withheld material information or lied, as the govenrment says they did, they breached the condition and voided any agreements.

In a comprehensive and persuasive report and recommendation, the magistrate judge concluded that the state had not promised defendants immunity from federal prosecution and that, even if it had made such a promise or led defendants to think it had, it had no authority to bind the federal government. He concluded that the state had not acted on behalf of the federal government at any stage of its negotiations with defendants and that the presence of a federal agent at one of the last investigative sessions did not demonstrate federal involvement in the investigation.

The magistrate judge explained why the doctrine of equitable immunity was not available to defendants and why the statements that defendants gave to the state prosecutors and investigators were not compelled in violation of the Fifth Amendment. (Defendants had not raised the Fifth Amendment issue but it was one that arose naturally in the course of analyzing their claims.) Finally, he concluded that even if defendants had been promised

immunity, they had breached their agreements by not giving full and truthful information about their drug trafficking activities, as the agreement required.

RECORD FACTS

The magistrate judge set out the facts in full in his report.  A brief summary, limited to those facts that are material, will put the parties' arguments in context.  Defendants Jacob Stadfeld and Brent Denzel were both involved in distributing marijuana in 2003 and 2004.  They did not know each other, but each knew Amos Mortier, who was their source of marijuana.  Delzer was a close friend of Mortier; Stadfeld seems to have been only a customer.

One of Mortier's suppliers was Reed Rogala, a New York resident who had begun dealing marijuana when he lived in Madison.  He and his then-girlfriend, Destin Layne, were close friends of Mortier.  Rogala sold marijuana to Mortier and another purchaser in monthly quantities of 80 to 100 pound quantities, with prices ranging from $3500 to $4500 a pound.  Rogala was not Mortier's only supplier: Charles Carpenter, a friend and roommate of defendant Delzer, was present when a load of marijuana from a different supplier was delivered to Mortier at Carpenter's house.

In September 2003, Rogala sent Mortier a load of marijuana that arrived in a moldy condition.  The two agreed that Mortier should throw out the worst of it, dry out what he

4

could and sell it a reduced rate, paying Rogala for the load when he could.  Mortier sold
some of the moldy marijuana to his regular customers, defendants Delzer and Stadfeld, and
he fronted about five pounds to Carpenter at a discounted price.

In October 2003, defendant Stadfeld stored a hockey bag full of the moldy marijuana
at a condominium owned by Fred Schubert, agreeing to pay Schubert $200 a month for the
privilege.  Over the Thanksgiving weekend, while Schubert was away, someone entered the
condominium and stole the hockey bag and its contents, leaving the patio door wide open,
with jimmy marks suggesting that the door had been pried open.  The burglar took nothing
else, although there were relatively expensive electronics in the residence he could have
stolen.  When Schubert returned home late on Sunday night, he discovered the open door,
no hockey bag and a missing leather coat, he called defendant Stadfeld (at 11:42 p.m.).  One
minute later, Stadfeld (or someone using his phone) called Mortier.  Stadfeld arrived at the
condo within 20 minutes of the call.  Schubert called the police, although Stadfeld suggested
he might have difficulty explaining the loss of a large quantity of marijuana.  (Presumably,
Schubert reported only the pried-open door and the missing leather coat, which he later
discovered was still in his house.)   The officer thought the scene looked like a drug ripoff,
but did not say so in his report.

John Brubaker started buying marijuana from defendant Stadfeld in 2001, stopped
doing so from August 2003 until December 2003 and stopped for good in July 2004.  In the

5

second time period, he was buying five pound lots for approximately $4500 a pound, paying $6000 to $8000 upon receipt of the marijuana and paying the rest when he picked up his next order. A purchase he made in December 2003 involved foul smelling marijuana that Stadfeld discounted to about $3000.

In the summer of 2004, about a week after Stadfeld's wedding, Brubaker gave Stadfeld $8000 as a down payment on $20,000 worth of marijuana he hoped to sell before beginning graduate school. He gave Stadfeld $8000 as a down payment on five pounds, promising to pay $12,000 more when the marijuana arrived. It did not, but Stadfeld never returned the $8000.

Sometime in or around October 2004, Mortier discovered that he was broke, despite his frenetic marijuana distribution. He was unable to understand how he had reached that point. When Reed Rogala came back to Madison for the Halloween weekend, Mortier talked with him about his finances at Destin Layne's residence. At some point in the discussion, Rogala came to the conclusion that Mortier had never caught up with the debt to Rogala he had incurred for the purchase of the moldy marijuana the year before, which amounted to about $60,000 to $80,000. And why not? The two went over Mortier's sales and determined that defendant Delzer still owed Mortier $10,000 and a man named "Jake" owed the rest ($50,000 to $70,000). Layne overheard part of the conversation and identified "Jake" as defendant Stadfeld, whom she had met when she was working a

6

representative for a record company and he had given her a CD for his band, with his picture on it. Mortier confirmed that the picture was of defendant Stadfeld, whom he knew only as Jake.

When Mortier told Rogala about the theft of marijuana from Schubert's condominium, Rogala found the burglary story suspicious and told Mortier so. Layne volunteered to obtain the police report, which she did on November 3, 2004 and read it to Mortier over the phone. (About that same time, defendant Stadfeld also developed an interest in the police report and asked Schubert to obtain a copy of the police report of the same burglary, which he did.) Delzer was with Mortier when Layne called to read the police report. Layne urged Mortier not to confront defendant Stadfeld or make any rash inquiries. She never spoke again to him or saw him after that day.

Telephone records show that Mortier called Stadfeld on November 4 in the late morning and that Stadfeld called Schubert, then called Mortier back, after which Schubert called Stadfeld and Stadfeld called Mortier, all within a period of three hours. Mortier never received any money from Stadfeld to pay his debt to Rogala.

On November 8, 2004, Mortier was supposed to have dinner with defendant Delzer and Bonnie Slocomb. He never arrived and he never called to explain his absence. That afternoon, his cell phone powered down between 3:30 and 4:00 p.m. Cell tower reports show that at about 3:31 p.m. on the 8th, defendant Stadfeld used his cell phone near

7

Mortier's residence.  No one has ever reported seeing Mortier again.

In late 2004, an assistant district attorney for Dane County, Corey Stephan, obtained an order from the state circuit court to open a John Doe investigation into Mortier's disappearance.  He served subpoenas on many of Mortier's known friends and associates, including defendants.  With the advice of counsel, both defendants decided independently not to testify in the John Doe proceeding but to talk with Stephan and the detectives informally.  Before doing so, each defendant entered into an informal oral agreement with Stephan to the effect that if they told the truth about every aspect of the drug distribution scheme, including sources, sellers, buyers, amounts, etc., and what they knew about Mortier's disappearance, the state would not prosecute them for their marijuana dealing. If they did not, there was no deal and prosecution would follow.

Defendant Delzer and his counsel met with Stephan and local detectives David Bongiovanni and Shannan Shiel-Morgan in the district attorney's office on December 17, 2004, in lieu of appearing in the John Doe inquiry.  He met twice more with Stephan and the detectives two more times, on April 20, 2005 and June 3, 2003.  At the December interview, defendant Delzer was asked whether his roommate, Charles Carpenter, was involved in any marijuana dealing.  Detective Morgan made a note of his answer: "Charles took bluebin—took to GF's took to 'Missy'  No involve in it".  At the evidentiary hearing, Morgan testified that defendant had said that Carpenter was not involved and that this was

8

what her notes showed.  She admitted that she had not included this statement in her typed report, but said that the omission was inadvertent.  At his April interview, defendant Delzer described a drug delivery to the house he shared with Carpenter but did not say whether Carpenter was present for the delivery.

Defendant Stadfeld and his lawyers met on December 15, 2004 with the detectives and his own lawyers, without Stephan, before his agreement with Stephan was final.  He met again with the detectives and two of his lawyers on April 19, 2005 and told them for the first time that he had been selling drugs for Mortier and that Mortier was in trouble with "the guys" for whom he was selling drugs.  He told them that Mortier had had 16 pounds of marijuana stolen from him when he was out of town over Thanksgiving in 2003.  He said that he did not know whether the loss was the result of a home invasion or whether Mortier had fronted the marijuana to someone who did not pay him.  When asked what he meant about Mortier's being in trouble with "the guys," he told the detectives that Mortier had called him during the week before November 4, 2004, asking for $20,000 to pay his suppliers for the stolen marijuana.  He said also that he had located $10,000 and had taken it to Mortier on November 4.  At first defendant Stadfeld said that the money had come from sales to "Mr. Money" and to "Music Go Round," but when pressed, he said he had borrowed it from a friend, John Brubaker, over the Halloween weekend.

Stadfeld met with the detectives on May 10, this time with only one of his lawyers

9

present.  He elaborated on his earlier statements about a theft from Mortier of 16 pounds of marijuana, saying that he too had lost marijuana (4 1/2 pounds) in a theft from a storage unit at Badger Storage on Commercial Avenue.  He was not able to explain how he knew that Mortier had lost 16 pounds.

Stadfeld told the detectives that he and Mortier believed they had been robbed by their New York source, who wanted to keep them in the business.  He said that he believed he had been followed by one of the New York guys to see where he was storing his marijuana and that the lock on the unit was cut.  After Detective Bongiovanni reminded him that the units were electronically controlled, Stadfeld said that was the reason he had chosen Badger Storage.

Stadfeld had a final meeting on July 20, 2005 with his lawyer and with the investigators.  At this meeting, they were joined by Jerome Becka, an agent of the federal Drug Enforcement Agency, who was interested in a person whose name had surfaced in both the Mortier investigation and in Becka's investigation of Mario Morris.  At the time, the DEA had no interest in the Mortier investigation, in defendants or in their particular marijuana conspiracy.  Stadfeld told the detectives that Brubaker had given him $6,000 for a delivery of marijuana about a week after Stadfeld's wedding in July 2004; he then changed his story and said that Brubaker had given him the $6,000 in November, when Stadfeld needed it to give to Mortier.  He added that Brubaker drove to Madison a second time in

10

November to give Stadfeld another $2,000.  He reiterated that he was never in debt to 11 Mortier.

The detectives' first contact with persons in the U.S. Attorney's Office came on July 27, 2005, when, at Stephan's recommendation, they made a federal referral of the marijuana trafficking investigation.  Stephan believed that local agencies did not have the time, money or ability to pursue the out-of-state leads that had developed during the state investigation.  On August 8, 2008, a grand jury returned a federal indictment against both defendants, charging them with conspiring to distribute marijuana in excess of 100 kilograms.

OPINION

Defendants have filed objections to the report and recommendation, raising a number of different issues.  Their objections are distinct and I will address them separately as to each defendant.

B. Defendant Stadfeld

Defendant Stadfeld objects to a number of the factual findings made by the magistrate judge, but only as they relate to the magistrate judge's conclusion that he breached the terms of the nonprosecution agreement with the state.  He does not take issue with the determination that his agreement with the state was never intended to bind the

11

federal government or that, as a legal matter, it could not bind the federal government. However, he argues strongly for application of equitable immunity, if only for the enhancement of "'the honor of government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government.'" Dft. Stadfeld's Objs., dkt. #124, at 8 (quoting United States v. Oruche, 257 F. Supp. 2d 230, 238 (D.D.C. 2003)).  I assume from this that defendant accepts the magistrate judge's conclusion that he was never promised immunity from federal prosecution by any state or federal official and that his only objections are to the finding of breach and the rejection of his equitable immunity argument.  I assume as well that defendant Stadfeld does not assert that his statements to the detectives were compelled in violation of the Fifth Amendment.

Defendant Stadfeld asks for a de novo determination of those portions of the report or those specified proposed findings or recommendations to which he objects.  I construe this as a request to review the testimony of the witnesses at the extended evidentiary hearing, which I have done, and not as a request to convene another hearing.

1. Equitable immunity

Defendant Stadfeld criticizes the magistrate judge's conclusion that equitable immunity is not available to defendant, saying that although the conclusion meets the letter of the law, it misses the fundamental point that courts must take into consideration the

12

honor of the federal government.  To defendant, there is an unseemliness surrounding this case:  the state prosecutor failed to negotiate a clear and precise agreement with him; his lawyers failed to appreciate the potential risk to him and the consequences of an incomplete and informal nonprosecution agreement; and defendant was misled into believing that his statements were fully protected until they were not.

This federal prosecution may appear unseemly to defendant Stadfeld, but there is nothing illegal about it or, on close inspection, any real unfairness.  Equitable immunity does not exist, if it exists at all, to protect defendants from "unseemliness"; at most, it might apply in this case if defendant Stadfeld had reached a meeting of the minds with the federal government and the agreement induced him to make statements to his detriment.  United States v. Fuzer, 18 F.3d 517, 521 (7th Cir. 1994).  Defendant never negotiated with any representative of the federal government and thus, could not have reached the requisite meeting of the minds on the central issue he is advancing, which is that the government would not prosecute him if he carried out his part of the bargain.  Arkebauer v. Kiley, 982 F.2d 1351 (7th Cir. 1993) (noting that Seventh Circuit had never recognized doctrine of equitable immunity and holding that defendant could be prosecuted in one Illinois county despite another Illinois county's promise to him that he was immunized from prosecution).  I conclude that defendant Stadfeld has not shown that the doctrine of equitable immunity is available to him.

13

In large part, this discussion of the doctrine of equitable immunity is irrelevant. Even if it were recognized in this circuit and even if I were to find that defendant Stadfeld's agreement with the state bound the federal government, which I do not, he would not be entitled to claim the protection of the doctrine if he breached his agreement with the state. I turn next to that question.

## 2. The alleged breaches of the nonprosecution agreement

As in contract law in commercial applications, a determination of a breach of a nonprosecution agreement requires a finding of failure to carry out a term of the parties' agreement and a showing that the failure (the breach) was material to the agreement. (Although it might be more accurate to refer to defendant Stadfeld's obligation to provide truthful information as the express condition that, if fulfilled, would trigger the state's promise to provide immunity, I will follow the parties' lead and refer to the alleged breaches of the agreement.)

In its brief in opposition to defendants' motions to dismiss the indictment, the government contended that the court should deny the motion because defendant Stadfeld had violated the nonprosecution agreement in nine ways, as listed in the chart it used at the evidentiary hearing, Evid. Hrg. exh. 7-1:

(1) defendant's failure to disclose his responsibility for the burglary at Schubert's;

(2) his statement that he gave Mortier $10,000, $8,000 of which was a loan from John Brubaker;

(3) his lies about his activities on November 9, 2004;

(4) his failure to disclose the second "ghost" phone he used for business;

(5) his repeated statement that Brubaker had lent him $8,000 in November;

(6) his statement that he did not owe Mortier any money in November 2004;

(7) his statement that he left his house on November 9, 2002 at 10:00;

(8) his statement that he had stored marijuana at Badger Storage in November 2003; and

(9) his statement that he drove past Mortier's house on November 8, 2004 because he was concerned about Mortier.

(The magistrate judge used a different numbering system in his report; I have followed the numbering system in Evid. Hrg. exh. 7-1.)

The magistrate judge found that three of these alleged omissions or lies fit the government's characterization:  defendant's failure to tell the truth about the burglary of Schubert's condominium (1); his failure to tell the truth about Badger Storage (8); and his statements about the alleged loan from Brubaker (2) and (5).  The magistrate judge found that the government had not proved that defendant's statement about the ghost phone (4) was an intentional falsehood.  He reached the same conclusion about defendant's alleged

15

falsehoods and omissions related to his activities on November 8 and 9, 2004, (3), (7) and (9):  these were "not sufficient stand-alone material falsehood[s] to support a finding of breach."   Dkt. #112 at 59.  (Although the magistrate judge did not discuss defendant Stadfeld's statement about not owing money to Mortier in November 2004 (6) in connection with the falsehoods related to defendant's activities on November 8 and 9, it is a related item, because it suggests that defendant Stadfeld was concerned about providing a possible motive he might have had for making Mortier disappear.)

The government did not file any objections to the findings with respect to alleged omissions (3), (4), (7) & (9) and I am not persuaded that the magistrate judge erred in reaching his conclusions on those.  It did not object to the magistrate judge's failure to discuss defendant's statement that he did not owe Mortier money in November 2004.  Therefore, it is not necessary to take it up.

Before addressing the alleged omissions to which defendant Stadfeld objects, I will take up his objections to the credibility of witnesses Rogala and Layne.  Defendant has good reasons for questioning their credibility.  Each has been convicted of felony distribution of marijuana and is serving a prison term.  Each stands to benefit from his or her testimony at the evidentiary hearing if it leads the government to recommend a reduction in his or her sentence.  Moreover, Rogala had an obvious incentive not to appear concerned about the $70,000 to $80,000 that Mortier owed him, which was more than defendant Stadfeld owed

16

Mortier, and to say on the witness stand that he did not plan his Halloween trip to Madison for the purpose of collecting the money Mortier owed him.

Despite these reasons to distrust Rogala's testimony, I am not persuaded by defendant's assertion that Rogala steered Mortier into thinking that Stadfeld was the source of his financial troubles and that Rogala did so to protect himself. Certainly Rogala wanted to be paid the outstanding balance on the marijuana he had delivered, but why would he focus on defendant Stadfeld? Defendant has produced no evidence that Rogala knew him before Halloween 2004 or knew that he was a customer of Mortier. Although Layne had met Stadfeld once or more, she met him in his role as a musician, not as a drug dealer. Defendant Stadfeld has adduced no evidence that either Rogala nor Layne knew anything about the scale of his marijuana distribution or had any reason to think he was financially able to pay Mortier what he owed. There is no evidence that Rogala and Layne had any opportunity to discuss their testimony before they appeared at the evidentiary hearing; both were brought here from the separate prisons in which they had been housed. Neither had a incentive to lie and thereby jeopardize any anticipated sentence reduction.

Defendant suggests that Rogala had his own reason to make Mortier disappear, but again, he has presented no evidence or even a compelling hypothesis to support that suggestion. It makes more sense to think that Rogala wanted Mortier to pay his debt to Rogala, which would never happen if he disappeared. Finally, there is no evidence to

17

support a belief that Rogala burglarized Stadfeld's storage locker around Thanksgiving 2003, as Stadfeld alleges. At the same time, there is substantial evidence to support a finding that Stadfeld did not even have a storage locker in November 2003, as discussed below.

a. The drug ripoff at Schubert's condominium (1)

Defendant argues that the evidence does not support a finding that he stole the marijuana from Schubert's residence. I disagree. The evidence at the evidentiary hearing was that defendant Stadfeld was the only person other than Schubert who knew the marijuana was in the residence; he was the only person other than Schubert who had a key to the condominium; the burglar knew exactly where to go and what to take; the burglar ignored other items such as electronics that had resale value; the investigating police officer suspected the burglary might have been a drug ripoff; it is easy to scratch up a door latch or lock to make it look as if the door has been jimmied open; and defendant Stadfeld displayed no apparent concern about the loss of the marijuana when he showed up at Schubert's at midnight. To counter this evidence, defendant points out that Schubert did not suspect him; the police officer could not say definitely that the scene represented a drug ripoff and he never mentioned any theft of marijuana in his report; and no one ever recovered the bag or the marijuana.

The failure to mention a theft of marijuana is not surprising; Schubert never told the

police that he was missing any.  He told the police that the only other item he thought had been stolen was his leather coat.  The other alleged discrepancies do not change my view that it is more probable than not that Stadfeld committed the burglary and that he later sold the moldy marijuana to his customers, including Brubaker.

Defendant makes an additional argument to the effect that the loss of some moldy marijuana worth $70,000 would not have been significant enough to have upset Mortier, when he was receiving and selling five times that much each month.  Whether or not Mortier should have been upset by this allegedly small loss, he was.  His distress was confirmed by the testimony of Rogala, Layne and Estorff (a friend who hiked with Mortier in late October 2004), and statements Delzer made to the detectives.  Exh. #1-4 at 2. Among other things, defendant Delzer told the detectives not only about Mortier's concern about his financial situation but also about Mortier's angry phone call to Stadfeld.  Id.; Evid. Hrg. exh. #1-2 at 1.

Although defendant argues that the information about the burglary was not material and therefore, does not amount to a breach, he is wrong.  It helped explain both why Mortier was out of cash (because Stadfeld had not paid him for the marijuana that had been "stolen") and because it showed that Stadfeld was not above cheating Mortier out of what he owed him for fronted marijuana.

The very materiality of the information raises another question.  Under the agreement

19

with the state, defendant Stadfeld breached the agreement only when he withheld information about his role in drug distribution. Stefan did not tell Stadfeld that he would not prosecute him if he was involved in Mortier's disappearance. Therefore, Stadfeld was at risk if he disclosed information tending to incriminate himself in Mortier's disappearance. As I have found, the staged drug ripoff was highly material to the inquiry into Mortier's disappearance. It went a long way toward filling in the picture that was emerging: two different people involved in the investigation had asked for the police report shortly before Mortier disappeared; Mortier had been depressed about his shortage of funds; and on either November 3 or 4, 2005, Mortier had received a telephone call that caused him to yell at the caller. It does not take much imagination to suspect that a debtor such as Stadfeld would be concerned that his supplier is angry with him for cheating him out of $50,000 or more and will be pressing to collect the debt. Apparently, Layne was concerned enough to warn Mortier not to take any rash steps in pressing Stadfeld.

Defendant Stadfeld's failure to volunteer information to the detectives about the supposed theft of the marijuana would not have been a breach of his agreement with the state because he had been given no guarantee of protection from prosecution for his part in Mortier's disappearance. Without such a promise, he was protected by the Fifth Amendment from incriminating himself. He could have simply kept his mouth shut or invoked the amendment. To his detriment, however, he did neither of these things.

20

Instead, he lied about the theft, volunteering inaccurate information.  He said, for instance, that he had been storing marijuana at Badger Storage and that it had been stolen from his locker when someone cut the lock.  He said also that Mortier had had 16 pounds of marijuana stolen from him around Thanksgiving 2003, a circumstance that he attributed to Mortier's New York suppliers.  The detectives knew that the Badger Storage story was a lie; the storage lockers did not have locks, but electronic keypad access, and defendant did not have a unit there in November 2003, although he had rented one there in the past. Stadfeld's proffer of information about a theft of marijuana from Mortier around Thanksgiving 2003 was unconvincing and obviously provided to distract the detectives from focusing on Stadfeld's involvement in the Schubert burglary.

b. Storing marijuana at BadgerStorage (8)

The magistrate judge found that defendant Stadfeld lied during his May 10, 2005 interview when he told the detectives about a Thanksgiving drug theft from a locker he rented at Badger Storage.  The evidence at the evidentiary hearing supports that finding. The manager of the facility testified that defendant did not rent a unit at Badger Storage in November 2003 and that the units did not have locks but electronic keypads.  This last bit of information thoroughly undermined defendant Stadfeld's testimony that the burglars cut the lock on his Badger Storage unit.  Defendant suggests that this is not a real lie but might

21

have been a simple instance of poor memory, saying that he changed his storage units frequently, as he told the detectives at his July 20, 2005 interview. Exh. #41-1 at 4.  This explanation seems implausible, especially because Stadfeld had opportunities to correct his initial statement about the thefts and never did.  I agree with the magistrate judge that Stadfeld's initial statement to the detectives in his May 10, 2005 interview was a lie.

That this lie was also material is not really open to question.  Stadfeld was trying to throw the detectives off the scent.  They thought he had carried out a fake burglary at Schubert's condominium to cheat Mortier; he was trying to make them think that he had had only a small amount of his marijuana stolen and what little there was stolen from a storage locker and not from Schubert's residence.  Given the materiality of the fake burglary at Schubert's, the attempt to cover it up qualifies as a material breach of the nonprosecution agreement.

c. The "loan" from John Brubaker (2) and (5)

The last of the alleged breaches to which defendant Stadfeld objects involves a so-called loan from John Brubaker, one of Stadfeld's marijuana customers.  Stadfeld told the detectives that when Mortier called him in November 2004 to say that he needed $20,000 to give to "the guys" from New York before November 8, Stadfeld tried to help him out by borrowing money from Brubaker.  He said that at first he obtained $6000 from Brubaker

22

and that Brubaker drove to Madison sometime later to lend him another $2000.  Brubaker told the detectives and testified before the grand jury and at the evidentiary hearing that the money was not a loan but payment for marijuana Stadfeld was to provide him for resale and that he had given it to Stadfeld in July.

## B. Defendant Delzer

Defendant Delzer has raised two objections to the magistrate judge's report and recommendation.  He takes issue with the conclusion that the United States was not guilty of any inequitable conduct and he denies that he breached his agreement with the state.

### 1. Equitable immunity

Although this issue is largely governed by the analysis applied to defendant Stadfeld's argument, defendant Delzer raises some different issues.  He argues first that "it makes no sense," Dft. Delzer's Br., dkt. #134 at 1, that the federal prosecutor would have been unaware of the immunity agreement between him and the state.  I am not sure of his precise point.  If he is alleging that the state kept the United States Attorney apprised of the investigation, he has proffered no evidence to support that assertion.  His statement that Agent Becka "had contact with the case from its beginning," id. at 2, is true, but immaterial because Becka's contact with the case was connected to his own investigation of persons

23

involved in a large marijuana to which he had been alerted by the detectives, who came upon in the course of their investigation of Mortier's disappearance.   Becka testified that he met with a person identified as a witness in the Mortier case whom he knew, that he was called by the investigating detectives about the marijuana grow, that he was asked whether he had information about any of the persons they had identified and that he helped the detectives obtain administrative subpoenas for telephone records, Hrg. Tr., dkt. #78, at 137-38, but that he never opened a file on either defendant.  Id. at 138. He testified that he never was asked to talk to the United States Attorney about obtaining immunity for either defendant and he never did so.  Id. at 139.  He never sat in on any interview with defendant Delzer, id., although he did sit in on defendant Stadfeld's last interview on July 20, 2005, because he was interested in information Stadfeld might have about the separate investigation on which Becka was working.  Id. at 140.

If defendant is asserting that the United States Attorney learned about the information that the state developed from defendant Delzer, he is correct, but it does not follow that equitable immunity is available to defendant.  No one denies that the United States Attorney has had access to the information developed by the investigating detectives, but nothing about that access makes it inequitable for the federal government to prosecute defendant.  The government may not use the information that either defendant gave, United States v. Eliason, 3 F.3d 1149, 1153-54 (7th Cir. 1993) ("due process clause requires

24

prosecutors to scrupulously adhere to commitments made to suspects in which they induce the suspects to surrender their constitutional rights in exchange for a prosecutorial promise not to use that information" against them), unless it can establish that the agreement is no longer binding because it was breached.

Defendant Delzer adopts his co-defendant's argument that this court should consider the honor of the federal government as well as the public confidence in the fair administration of justice when deciding not to afford defendant equitable immunity.  I have considered those concerns but I am not persuaded that they override the law in this area, which is clear.  Equitable immunity is not available in a situation such as this one in which there has been no meeting of the minds.  The federal government was not a party to the agreement between defendant Delzer and the state and it never agreed not to prosecute defendant.  It is not breaking an express or implied promise when it does so.

2. <u>Breach of agreement</u>

Defendant Delzer contests the magistrate judge's finding of a breach resulting from defendant's failure to disclose Charles Carpenter's involvement in marijuana distribution. He denies that he told the detectives that Carpenter was not involved and argues that even if he did, the omission was not so material as to constitute a breach.

Defendant Delzer's situation is considerably more sympathetic than his co-

25

defendant's because he was far more forthcoming in his interviews with the state.  In fact, the government has identified only four matters about which defendant withheld information.  The first is defendant's failure to name his friend and one-time roommate Charles Carpenter as a player in the conspiracy.  Although Detective Shiel-Morgan's notes on this matter are cryptic at best, I find her credible when she says that they mean that defendant told her that Carpenter was not involved.

The omission was material.  According to Carpenter's testimony at the evidentiary hearing, between 2000 and November 2004, defendant Delzer was fronting him marijuana in quantities up to five pounds; dkt. #83 at 30-31; Delzer fronted him five pounds of moldy marijuana sometime between November 2003 and November 2004, id. at 32-33; and he was present when Mortier delivered marijuana to be stored at the house that Carpenter shared with defendant.  Id. at 33-34.  As a co-conspirator, Carpenter might have been able to give the detectives information about the marijuana distribution and, in particular, added to their information about the moldy marijuana, which plays such a key role in the story.  His actual inability to aid the investigation does not change my decision about the materiality of the omission.  Defendant Delzer would not have known whether Carpenter could provide helpful information and it was not his place to assess the value of such information.  That was the role of the investigators.

The materiality of this information is not diminished by the fact that defendant

26

Delzer told the detectives about the theft of the moldy marijuana, his belief that defendant Stadfeld was the burglar and that Stadfeld and Mortier had an angry disagreement. Carpenter could have provided corroboration for this information

As to the other alleged omissions, however, I agree with the magistrate judge that the evidence on the challenged matters is either too unclear to support a finding that defendant Delzer lied about it or it is not material to the investigation.  As the magistrate judge concluded, the stories of the spring 2004 delivery are too conflicting to allow a factfinder to pick the "right" one and that in turn makes it impossible to decide whether the version defendant provided was a lie or even an intentional omission.  The remainder are immaterial in themselves or in light of the other information that defendant provided.

Recognizing the closeness of the question, I find that defendant Delzer breached the terms of his nonprosecution agreement when he made the conscious decision to lie about his friend's involvement in the marijuana distribution.


ORDER

For the reasons stated in the report and recommendation entered by the United States Magistrate Judge on January 26, 2010 and in this opinion and order, IT IS ORDERED that the motions of defendants Brent Delzer and Jacob Stadfeld to dismiss the

27

indictment against them are DENIED.

Entered this 28th day of April, 2010.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

28